9 F.3d 1553
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Gilbert PEARSON, the surviving natural parent of Teresa
Louise Pearson; Phyliss Pearson, the surviving natural
parent of Teresa Louise Pearson; Tonia Bovee, the surviving
spouse of Glenn Archie Bovee, deceased and surviving mother
of Heath Bovee, deceased, and Korrina Bovee; Korrina Bovee,
surviving daughter of Glenn Archie Bovee, deceased and
surviving sister of Heath Bovee, deceased, Plaintiffs-Appellants,
v.
UNITED STATES of America, By and Through the DEPARTMENT OF
INTERIOR, BUREAU OF LAND MANAGEMENT AND DEPARTMENT
OF the ARMY, Defendant-Appellee.
 Nos. 92-15868, 92-15874.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 10, 1993.
Decided Oct. 28, 1993.
 
 Before: KOZINSKI, THOMPSON and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Gilbert and Phyliss Pearson, Darren, Carla and Ashley Ford, and Tonia and Korrina Bovee ("the plaintiffs") appeal the district court's grant of summary judgment in favor of the United States, in their consolidated actions under the Federal Tort Claims Act (FTCA) for injuries sustained when vehicles they or their relatives were traveling in collided with horses or burros, managed by the federal government, on an Arizona state highway. We have jurisdiction over this timely appeal under 28 U.S.C. § 1291 and we affirm.
 
 FACTS AND PROCEEDINGS
 
 3
 This case involves three consolidated actions against the United States under the FTCA. The claims arose from two separate accidents in which cars collided with wild horses or burros on U.S. 95. One accident occurred near milepost 56.8 and the other near milepost 55.5 of U.S. 95, an unfenced Arizona state highway which runs through the U.S. Army Yuma Proving Grounds.
 
 
 4
 The Yuma Proving Grounds is part of the Cibola-Trigo Herd Management Area, an area established by the Bureau of Land Management (BLM) for the maintenance of wild free-roaming horses and burros. Management of wild horses and burros that inhabit the Yuma Proving Grounds is jointly administered by the Army and the BLM, with the BLM taking the "lead role." See Memorandum of Agreement between Yuma Proving Ground, U.S. Army and the Bureau of Land Management relative to the Management of Wild, Free Roaming Horses and Burros which Inhabit Public Lands under the Department of the Interior and National Defense Lands, 1978 ("1978 Memorandum of Agreement"); Cooperative Management Agreement between United States Army, Yuma Proving Ground and United States Bureau of Land Management, Yuma Resource Area, 1988 ("1988 Cooperative Agreement").
 
 
 5
 The plaintiffs allege that the United States government was negligent in (1) failing to prevent wild horses and burros from crossing U.S. 95; (2) providing food and water sources for the animals near U.S. 95; and (3) failing to warn motorists on U.S. 95 of the presence of the animals.
 
 
 6
 The government moved for summary judgment. It argued that the federal government, as a possessor of land abutting a state highway, owed no duty under Arizona law to motorists traveling on the highway and that any duty under Arizona law which would require the United States to prevent wild horses and burros from roaming onto a public highway was preempted by the Wild Free-Roaming Horses and Burros Act ("Burros Act"), 16 U.S.C. §§ 1331 et seq. The government did not argue that the district court lacked jurisdiction, because the discretionary function exception to the FTCA applied.
 
 
 7
 The district court granted summary judgment in favor of the government on all of the plaintiffs' claims, holding that the Burros Act created no independent duty on the part of the federal government to prevent wild animals from straying onto the highway and that the Burros Act "preempts any potential, state-imposed duty on landowners to prevent livestock or other animals from roaming onto public roadways." This appeal followed.
 
 DISCUSSION
 
 8
 We review de novo the district court's determination of subject matter jurisdiction. See Arizona Maintenance Co. v. United States, 864 F.2d 1497, 1499 (9th Cir.1989). It is "well-established law that ... jurisdictional defenses," such as the discretionary function exception to the FTCA's waiver of sovereign immunity, "cannot be waived by the parties and may be raised for the first time on appeal or even raised by a court sua sponte." Prescott v. United States, 973 F.2d 696, 701 n. 2 (9th Cir.1992) (quotation omitted).
 
 
 9
 The FTCA authorizes suits against the United States for damages for personal injuries when a private person would be liable under the law of the place where the act or omission causing the injury occurred. See 28 U.S.C. §§ 1346(b), 2674. Such a suit is not available, however, when the act or omission complained of is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the [g]overnment." 28 U.S.C. § 2680(a). The government has the burden of proving the discretionary function exception to the FTCA's general waiver of immunity. See Prescott, 973 F.2d at 702.
 
 
 10
 In accordance with the Supreme Court's decision in Berkovitz v. United States, 486 U.S. 531 (1988), we use a two-step test to determine whether the discretionary function exception applies. First, we consider "whether the challenged action is a matter of choice for the acting employees: '[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow' " and the employee fails to follow that course of action. Prescott, 973 F.2d at 703 (quoting Summers v. United States, 905 F.2d 1212, 1214 (9th Cir.1990)). Second, if the challenged conduct does involve an element of judgment, we must determine whether that judgment "is of a kind that the discretionary function was designed to shield." Id. (internal quotation omitted). The discretionary function was designed to protect from review decisions "susceptible to policy analysis." United States v. Gaubert, 111 S.Ct. 1267, 1275 (1991).
 
 
 11
 1. Failing to prevent wild horses and burros from crossing U.S. 95.
 
 
 12
 The United States government is protected by the discretionary function exception for the BLM's decision not to fence the land adjacent to U.S. 95 or otherwise prevent wild horses and burros from crossing the highway, notwithstanding the BLM's knowledge of accidents involving such animals on U.S. 95. First, no federal statute, regulation, or policy requires the BLM to fence federal grazing land adjacent to highways. See 16 U.S.C. §§ 1331 et seq.; 43 C.F.R. Part 4700; Cibola-Trigo Herd Area Management Plan, Final 1980, ("Management Plan");[1] Wild Free-Roaming Horse and Burro Program Guidance, 1983 ("Program Guidance"). Furthermore, we have previously determined that the Burros Act, though creating a duty on the part of the BLM to remove wild horses and burros that stray onto private land upon request,[2] "does not require the BLM to prevent straying in the first instance." Fallini v. Hodel, 783 F.2d 1343, 1345 (9th Cir.1986).
 
 
 13
 Second, the BLM's decision to leave the land adjacent to U.S. 95 unfenced and not prevent wild horses and burros from straying onto the highway is susceptible to the type of policy considerations protected by the discretionary function exception. See Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1028 (9th Cir.1989) (government need not "prove that it considered these [policy] factors and made a conscious decision on the basis of them"). The BLM has discretion to balance the safety gains to be achieved by fencing the highway, against the congressional directives to: (1) consider the wild horses and burros in the area where they are presently found as an "integral part of the natural system of the public lands," 16 U.S.C. § 1331; (2) manage the "wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands," 16 U.S.C. § 1333; (3) keep management activities "at the minimum feasible level" to avoid " 'zoolike' developments," 16 U.S.C. § 1333; Fallini, 783 F.2d at 1346 (quoting S.Rep. No. 92-242, 97th Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. & Ad.News 2149, 2151-52); and (4) manage the wild horses and burros "with the goal of maintaining free-roaming behavior," while considering the other uses of the public and adjacent private land. 43 C.F.R. §§ 47000.0-6(c), 4710.3.
 
 
 14
 The BLM's decision to leave U.S. 95 unfenced and allow wild horses and burros to cross the highway is readily distinguishable from cases where an agency is alleged to have ignored an established safety policy rather than to have balanced competing considerations. Compare Richardson v. United States, 943 F.2d 1107, 1112 (9th Cir.1991) (agency decision to install overhead ground wires at certain places and not others was not made in disregard of safety considerations), cert. denied, 112 S.Ct. 1473 (1992), with Summers, 905 F.2d at 1215-16 (agency failure to identify and warn of danger of hot coals on park beaches was not a balanced policy decision, but rather a departure from established safety policy); ARA Leisure Services Inc. v. United States, 831 F.2d 193, 195-96 (9th Cir.1987) (agency decision to design and construct road without guardrails was grounded in social and political policy, but agency failure to maintain road in safe condition was not grounded in policy). The BLM's discretionary decision not to prevent wild horses and burros from crossing U.S. 95 is not subject to "judicial second-guessing." United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984).
 
 
 15
 The United States is also protected by the discretionary function exception for the Army's decision not to fence the land adjacent to U.S. 95 or otherwise prevent wild horses and burros from crossing the highway. No federal statute, regulation, or policy requires the Army to fence federal land adjacent to highways. See 1978 Memorandum of Agreement; 1988 Cooperative Agreement. See also Berkovitz, 486 U.S. at 536. Rather, the Army has discretion to enter into cooperative agreements with the BLM and allow the BLM to take the lead role in management of the Yuma Proving Grounds. See 1978 Memorandum of Agreement.
 
 
 16
 The Army's agreement with the BLM, which provides that the BLM will take the lead in management of the Yuma Proving Grounds, is broad enough to confer management responsibility upon the BLM to decide whether to prevent wild horses and burros from crossing U.S. 95. This decision is susceptible to policy considerations of efficiency, effectiveness, and cooperation with federal agencies that share mutual interests. Following the direction given by Varig Airlines, we will not second-guess this decision. Varig Airlines, 467 U.S. at 814.
 
 
 17
 2. Providing food and water for wild horses and burros near U.S. 95.
 
 
 18
 The United States is also protected by the discretionary function exception for the BLM's decision to provide food along Highway 95 for wild horses and burros. This decision is susceptible to the type of policy considerations protected by the discretionary function exception. Policy considerations implicated in the BLM's decision of food placement, in addition to the safety of passing motorists, include the feasibility, expense, and safety of workers and animals if food were provided further from the highway and deeper within the national defense lands used for weapon and equipment testing.
 
 
 19
 The United States is also protected by the discretionary function exception for the BLM's decision to place water along the highway. While the BLM may develop "new sources of water" for the wild horses and burros to mitigate loss of access to water along the Colorado River, the BLM may not allow water developments for horses and burros "that would expand their present herd areas." See Management Plan at 13. "Herd area" means "the geographic area identified as having been used by a herd as its habitat in 1971." 43 C.F.R. § 4700.0-5(d). Program Guidance provides information for calculating the 1971 herd areas. It states:
 
 
 20
 Because the exact boundaries of herd areas may never be known in some cases, and because disagreement and confusion on the subject can be expected until firm herd area delineations are made, each district must seek to resolve the question in an objective manner. An intensive effort should be made to seek documentation that would support a delineation of herd area boundaries, and to incorporate these herd areas into the land use plan....
 
 
 21
 In cases where no objective determination about herd areas can be made by analyzing the information available, the authorized officer may elect to address the question of 1971 herd areas by planning area....
 
 
 22
 Program Guidance at Enclosure 1-14.
 
 
 23
 The Management Plan does not explicitly delineate the boundaries of the 1971 herd areas. The Management Plan states:
 
 
 24
 The wild horse and burro populations within the Cibola-Trigo Herd Management Area (C-T HMA) roam freely on lands with different administrative responsibilities. These animals roam off and on lands administered by the Yuma BLM District, Cibola National Wildlife Refuge, Imperial National Wildlife Refuge, U.S. Army Yuma Proving Ground, and the State of Arizona ....
 
 
 25
 The key to managing the Cibola-Trigo Herd Management Area is to manage the critical area. The critical area is an area radiating out from the Colorado River in which large populations of burros concentrate around permanent water sources during the hot or dry seasons. The critical area consists of approximately 253,000 acres....
 
 
 26
 Management Plan at 1 (emphasis added).
 
 
 27
 The BLM's placement of water along the highway did not expand 1971 herd areas, regardless of whether the water placement encouraged animals to cross U.S. 95 and regardless of whether the Management Plan is interpreted to define herd areas by herd habitat or planning area. The Management Plan indicates that the herds roam off and on lands administered by the State of Arizona, such as U.S. 95. The Management Plan also indicates that the planning area includes the Yuma Proving Grounds, which lies on both sides of U.S. 95.
 
 
 28
 As long as herd areas were not expanded by the location of new water sources, which they were not, the water placement decision was discretionary. The BLM's decision to place water sources along the highway is susceptible to the same policy considerations implicated in its decision to place food sources along the highway. Accordingly, judicial review of the BLM's decision is inappropriate.
 
 
 29
 The United States is also shielded by the discretionary function exception for the Army's decision to provide food and water along the highway. No mandatory federal statute, regulation, or policy clearly dictates a particular course of conduct for the Army to follow on the subject of feeding or watering wild horses and burros, jointly administered by the Army and the BLM, found on the Yuma Proving Ground. See 1978 Memorandum of Agreement; 1989 Cooperative Agreement.
 
 
 30
 The Army has discretion in carrying out its managerial responsibilities of the wild horses and burros. In providing food and water near the highway for the wild horses and burros, the Army had to consider the multiple uses of the land, the safety of animals and federal employees if food and water were provided further within the defense lands, and the expense. Again, Congress has directed that decisions susceptible to policy analysis are not subject to judicial review.
 
 
 31
 3. Failing to warn motorists on U.S. 95 of the possible presence of wild horses and burros
 
 
 32
 The United States is protected by the discretionary function exception for the BLM's decision not to post warning signs on U.S. 95. While no federal statute, regulation, or policy requires the BLM itself to post warning signs on U.S. 95, the Management Plan does require the BLM to initiate a program with the Arizona Department of Transportation (ADOT) to alleviate auto-horse and auto-burro collisions. Management Plan at 17, 21. Specifically, the Management Plan provides:
 
 
 33
 This action consists of initiating a program with Arizona Department of Transportation to place highway warning signs on horse and burro crossings.
 
 
 34
 The warning signs should be erected near the known crossing points as follows:
 
 
 35
 1. Highway 95 in vicinity of Laguna Road;
 
 
 36
 2. Highway 95 in vicinity of mile post 49.5;
 
 
 37
 3. Highway 95 in vicinity of mile post 58;
 
 
 38
 4. Martinez Lake Road 1/2 mile from Highway 95, at pipeline crossing.
 
 
 39
 Id.
 
 
 40
 The plaintiffs do not allege that the BLM failed to fulfill its nondiscretionary duty to initiate a program with ADOT to post the highway warning signs. In fact, a report prepared by the plaintiffs' expert indicates there are seven animal warning signs posted by the State of Arizona on southbound U.S. 95 between mileposts 50.0 and 75.8, and six animal warning signs posted northbound U.S. 95, between mileposts 42.3 and 71.7. See also Plaintiffs' Statement of Facts in Support of Partial Response to Defendant United States' Motion for Summary Judgment, Nov. 8, 1991, Exh. D at 1 (ADOT Traffic Engineering Study, U.S. 95 (M.P. 46.8-51.5) which states that "in accordance with the ADOT HALISIP Program, a section on US 95 north of Yuma has been identified as a candidate for safety improvements to reduce animal-related traffic accidents"). The BLM's reliance on Arizona to fulfill the signing program is a discretionary decision, grounded in policy implications and concerns of federalism, and is shielded from review.
 
 
 41
 The qualified immunity exception also immunizes the United States from any liability stemming from the Army's decision not to post warning signs on U.S. 95. No federal statute, regulation, or policy requires the Army to post warning signs on U.S. 95. See 1978 Memorandum of Agreement; 1989 Cooperative Agreement. Rather, the Army has discretion to enter into cooperative agreements with the BLM and allow the BLM to take the lead role in management of the Yuma Proving Grounds. See 1978 Memorandum of Agreement. The Army's agreement with the BLM is broad enough to confer the BLM with the management responsibility of deciding whether to post warning signs along U.S. 95.
 
 
 42
 Because the discretionary function exception to the FTCA's waiver of sovereign immunity shields review of all of the alleged acts of negligence by United States' employees, we need not decide whether federal law preempts any potential state imposed duty on landowners to prevent wild horses and burros from roaming onto public roadways.
 
 
 43
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 We have taken judicial notice of the entire Management Plan, which was prepared by John A. Phillips, Range Conservationist, and the Yuma District BLM. See Fed.R.Evid. 201(b) & (f). At oral argument, all parties agreed this was appropriate
 
 
 [2]
 The plaintiffs do not point to any evidence in the record to support their contention that the State of Arizona requested the BLM to remove any wild horses or burros that strayed onto the highway. See 43 C.F.R. § 4720.2-1 (requiring written request). In the absence of a request, the BLM's nondiscretionary duty is not triggered